**RECEIVED**

APR 0 4 2008

**JAMES BONINI, Clerk**
CINCINNATI, OHIO

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA
*ex rel.* [UNDER SEAL]

BRINGING THIS ACTION ON BEHALF
OF THE UNITED STATES OF AMERICA,

                    Plaintiffs and Relators,

            v.

[UNDER SEAL]

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. **2:08CV312**

Judge **J. WATSON /ABEL**

**FILED UNDER SEAL**
pursuant to 31 U.S.C. § 3730
and Local Rule 3.2

**DO NOT SERVE**

<u>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**</u>

# UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA     :
ex rel. LAURA LOVETT AND      :      CIVIL ACTION NO. 2:08-cv-312
LISA MAYHEW,                    :
                               :
        Plaintiffs and Relators,   :
                               :      JUDGE WATSON / ABEL
        v.                           :
                               :
HOLZER CLINIC                  :
90 Jackson Pike             :
Gallipolis, OH 45631        :
                               :     **FILED UNDER SEAL**
        and                  :     pursuant to 31 U.S.C. § 3730
                               :     and Local Rule 3.2
KELLY J. ROUSH, DC       :
Holzer Clinic              :
4th & Sycamore Street     :
Gallipolis, OH 45631,      :
                               :
        Defendants.        :

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

**I.    INTRODUCTION**

1.    *Qui Tam* Relators Laura Lovett and Lisa Mayhew bring this action on

behalf of the United States for treble damages and civil penalties arising from

Defendants' conduct in violation of the United States Civil False Claims Act, 31 U.S.C.

§§ 3729-3733.  The violations arise out of false claims for reimbursement submitted to

various federally-funded medical coverage programs, including Medicare, Medicaid,

CHAMPUS, TRICARE, the Veterans Administration, as well as others.

2.    This complaint details several areas of illegal conduct by the Defendants

which caused the submission to federally-funded medical coverage programs of thousands of false claims in violation of the FCA.  These claims revolve around upcoding, provision of disallowed services, overutilization, and other abuses.

3.  Areas of violation described in detail below are:

A.  Holzer physicians and other personnel, acting at the direction of Holzer management and within the scope of their employment, regularly code new patient office visits at higher levels of reimbursement than are permitted in light of the severity of the presenting problem(s) and the level of service actually provided.

B.  Holzer chiropractors, to include without limitation defendant Roush, acting at the direction of Holzer management and within the scope of their employment, regularly order x-rays to be performed on patients.  These x-rays are then billed to federally-funded medical coverage programs despite regulations prohibiting reimbursement for such testing when ordered by chiropractors.

C.  Holzer chiropractors, to include without limitation defendant Roush, acting at the direction of Holzer management and within the scope of their employment, regularly bill federally-funded medical coverage programs for maintenance treatment despite regulations permitting reimbursement for active chiropractic treatment only by falsely using the "AT" modifier.

D.  Holzer physicians and other personnel, acting at the direction of Holzer management and within the scope of their employment, regularly bill federally-funded medical coverage programs for consultations when the nature and circumstances of the patient visits mandate they be billed as new patient evaluations.  Consultations are reimbursed at a higher level than new patient evaluations.

E.  Ancillary personnel, acting at the direction of Holzer management and within the scope of their employment, regularly perform and bill federally-funded medical coverage programs for History of Present Illness evaluations despite regulations prohibiting reimbursement unless these evaluations are performed by physicians, physician assistants, or nurse practitioners.

F.  Holzer physicians and other personnel, acting at the direction of Holzer management and within the scope of their employment, regularly code initial hospital inpatient evaluations at higher levels of reimbursement than are permitted in light of the severity of the presenting problem(s) and the

-2-

level of service actually provided.

G.   Holzer personnel regularly use UPINs of physicians unrelated to and who did not participate in the services rendered to bill federally-funded medical coverage programs for specialty services provided by substitute physicians.

4.   Each claim for reimbursement submitted to a federally-funded healthcare program which resulted from an instance of the conduct described in ¶ 3(A)-(G) constitutes a false claim.

## II. JURISDICTION AND VENUE

5.   Jurisdiction lies pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345.

6.   The acts proscribed by 31 U.S.C. § 3729(a) and complained of herein occurred within the Southern District of Ohio, and Defendants do business and are found therein.  Venue thus lies under 31 U.S.C. § 3732(a).

7.   The facts and circumstances which give rise to Defendants' violations of the False Claims Act have not been "publicly disclosed" as that term is defined in the False Claims Act.

8.   Relators are original sources of the information upon which this complaint is based, as that phrase is used in the False Claims Act.

9.   The allegations set out herein have been disclosed to the United States.

## III.   PARTIES

10.   The United States of America is the real party in interest.

11.   Relator Laura Lovett lives in Oak Hill, Ohio.  She has been employed by Defendant Holzer Clinic in Gallipolis since August 1999.  Until July 2000, she was Holzer's Medicare Billing Agent.  In July 2000, she became Account Representative, a

-3-

position she held until August 2007, when she became Holzer's Coding Education Specialist. She holds that position today. Her responsibilities include assisting in the training of personnel regarding proper coding practices, developing coding curricula, and auditing coded work.

12.     Relator Lisa Mayhew lives in Jackson, Ohio. She was employed by Holzer Clinic as Coding Education Coordinator from February 2001 until March 2008. Her responsibilities included coordinating coding educational activities and performing compliance auditing.

13.     Defendant Holzer Clinic Inc. ("Holzer") is an Ohio Professional Corporation wholly owned by physician shareholders. Its main facility is located at 90 Jackson Pike in Gallipolis, Ohio, with an additional nine clinics located in southeastern Ohio and northwestern West Virginia.

14.     Holzer employees more than 100 physicians covering dozens of specialities and general-practice areas, and dominates the delivery of medical services in southeastern Ohio and northwestern West Virginia. Many or most of the practitioners employed by Holzer are partners therein.

15.     Most of the 100-plus physicians work out of the main clinic in Gallipolis, and about half of Holzer's approximately 450,000 annual patient visits accounted for at that location.

16.     Clinic locations are:

Holzer Clinic Sycamore and Holzer Clinic Rehabilitation Services, 4th Avenue and Sycamore St., Gallipolis, Ohio 45631

   A.     Holzer Clinic Meigs County, 88 East Memorial Drive, Pomeroy, Ohio 45769

-4-

B.     Holzer Clinic Lawrence County, State Route 7, Proctorville, Ohio 45669.

C.     Holzer Clinic Jackson is located at 280 Pattonsville Rd., Jackson, Ohio
       45640.

D.     Holzer Clinic of West Virginia, 2605 Jackson Ave., Point Pleasant, WV
       25550.

E.     Holzer Clinic of South Charleston, 313 MacCorkle Ave., South Charleston,
       WV 25303.

F.     Holzer Clinic Athens, 224 Columbus Rd., Athens, Ohio 45701.

G.     Holzer Clinic Liberty Circle, 96 Township Rd. 369, Suite 101, Proctorville,
       Ohio 45669.

17.    Many or all of the claims for reimbursement described herein were and
continue to be submitted to Palmetto GBA, a third-party administrator for federally-
funded health coverage programs.  Palmetto GBA is a limited liability corporation
headquartered in Columbia, South Carolina, and is wholly-owned by BlueCross
BlueShield of South Carolina.

18.    Defendant Kelly J. Roush is a licensed chiropractor employed by Holzer.

## III.    FEDERAL RULE OF CIVIL PROCEDURE 9(b) ALLEGATIONS

19.    Much of the documentary evidence necessary to prove the allegations
contained herein is in the exclusive possession of either the Defendants or the United
States.

20.    The allegations of fact in this Complaint are personally known to one or
both of the relators unless specifically identified as being made on information and
belief.  Each allegation made on information and belief identifies a situation in which a
relator has, based upon her knowledge and experience, a reasoned factual basis to

-5-

make the allegation, but lacks complete details.

## IV.    BACKGROUND

### A.    Federally-Funded Medical Coverage Programs in General

21.    Medicare is a federally-funded medical insurance program which pays for medical needs of older Americans.  Persons who are age 65 and older, or who have certain debilitating health conditions, are eligible to enroll in Medicare.

22.    Medicare is known as a fee-for-service program, which means that enrollees pay some portion of the cost for medical care at the time that it is rendered. Medicare has three components: Part A, Part B, and Part D.  Part A covers some of the costs associated with hospital care, including inpatient and hospice care.  Part B, by contrast, covers some of the costs associated with medical care, including diagnostic testing and ambulance services.  Part B helps cover some of the costs of physician care associated with medically-necessary treatment regimens.  Part D covers some of the costs associated with prescription drugs.

23.    Medicaid is funded jointly between the federal government and the States. The United States pays slightly less than 60% of the cost of reimbursement under the Ohio Medicaid program, and 75.04% of the cost of reimbursement under the West Virginia Medicaid program.

24.    Other federally-funded medical coverage programs serve specific populations, to include military personnel and their dependents and veterans.  These include the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), TRICARE, and the Veterans Administration.

## B. Reimbursement for Medical Services Rendered

25.     The programs at issue here provide coverage for physician office visits for medical evaluation.

26.     When medical services are rendered to enrollees, those costs covered by the federally-funded programs are billed directly to the appropriate program using a Current Procedural Terminology ("CPT") codes developed by the American Medical Association and adopted by the Centers for Medicare and Medicaid Services ("CMS"), the agency within the Department of Health and Human Services ("HHS") charged with administering Medicare and Medicaid. CPT codes adopted by CMS are also known as Healthcare Common Procedure Coding System ("HCPCS") codes. For the sake of consistency and ease of understanding, references to codes in this complaint mean HCPCS codes.

27.     Each code uniquely identifies the specific medical service or services rendered and corresponds to an amount of reimbursement that is owed to the provider. For this reason, the financial integrity of all federally-funded healthcare programs depends upon the correct usage of the coding system.

## C. Evaluation and Management Coding

28.     Evaluation and Management services comprise more than 40% of the annual billings under the most expensive 200 Medicare Part B CPT codes. E&M Part B billings were $28 billion in 2006.

29.     The range of CPT codes from 99201 through 99499 apply to Evaluation and Management services.

30.     The three Evaluation and Management subgroups relevant to the allegations contained herein include Office or Other Outpatient Services (99201-99205; 99211-99215); Hospital Inpatient Services (99221-99223); and Consultations (99241-99245).

31.     The codes applicable to Chiropractic Manipulative Treatment are 98940 through 98943.

32.     Within each Evaluation and Management subcategory, the specific code to be used for purposes of billing federally-funded medical coverage programs depends upon the severity of the presenting medical problem(s) and the depth of the evaluation as measured by three key components.  These include:

> A.     History;
>
> B.     Examination;
>
> C.     Medical Decision-Making.

33.     Each Evaluation and Management code requires a particular level of service in each of the three key areas.[1]

34.     The required patient history includes the following elements:

> A.     Chief Complaint ("CC"), which is required in all Evaluation and Management evaluations.  This consists of a concise statement that describes the problem(s) and associated symptoms which prompted the visit.
>
> B.     History of Present Illness ("HPI"), which is a chronological description of the development of the patient's present illness.

---

[1]  Alternatively, if the documentation reflects that at least 50% of the time spent during the evaluation was devoted either to Counseling or to Coordination and Care, then the visit may be billed solely based upon the length of the visit, measured in time units.

        C.      Review of Systems ("ROS"), which consists of an inventory of up to 14 body systems which the physician obtains by asking a series of questions regarding the symptoms the patient is experiencing.

        D.      Past, Family, and Social History ("PFSH"), which consists of a review of the patient's past medical history, relevant medical history of the patient's family members, and the patient's lifestyle.

35.     The depth and breadth of a given history review determines which of four levels applies. The four levels include:

        A.      Problem Focused;

        B.      Expanded Problem Focused;

        C.      Detailed; and

        D.      Comprehensive.

36.     The second key component, the required examination, may involve several organ systems or a single organ system. The extent of this examination depends on the physician's judgment regarding the patient's past history and the severity of the presenting problem(s).

37.     Multi-system examinations consist of an examination of more than one of the following organ systems or body areas: constitutional symptoms; eyes; ears, nose, mouth, throat; neck; cardiovascular; respiratory; chest (breasts); gastrointestinal; genitourinary; musculoskeletal; integumentary; neurological; and psychiatric.

38.     There are four levels of examination, where the particular level applicable to a given examination depends upon the documented scope of the examination. The four levels are:

        A.      "Problem Focused," which can be used only when the examination consists of, and the documentation of the patient visit demon-strates, review one to five elements in one or more organ systems

-9-

or body.

    B.    "Expanded Problem Focused," which can be used only when the examination consists of, and the documentation of the patient's visit demonstrates, review of at least six elements in one or more organ systems or body areas.

    C.    "Detailed," which can be used only when the examination consists of, and the documentation of the patient's visit demonstrates, review of at least twelve elements in one or more organ systems or body areas

    D.    "Comprehensive," which can be used only when the examination consists of, and the documentation of the patient's visit demonstrates, review of at least two elements from at least nine organ systems or body areas.

39.    A single-organ-system examination consists of a complete examination of one specific organ system and other symptomatic or related organ systems. In the case of a single organ system examination, there are four levels of examination, including:

    A.    Problem Focused;

    B.    Expanded Problem Focused;

    C.    Detailed;

    D.    Comprehensive.

40.    The third key component in determining the appropriate level of service, medical decision-making, refers to the complexity of establishing a diagnosis and selecting a management option. This is dependent on the following factors:

    A.    The number of possible diagnoses and/or the number of management options.

    B.    The amount and/or complexity of medical records, diagnostic tests, and other information that must be obtained, reviewed and/or analyzed.

-10-

C.     The risk of significant complications, morbidity, and/or mortality as well as co-morbidities associated with the patient's presenting problem(s).

41.     There are four levels of medical decision making, including:

A.     Straightforward;

B.     Low Complexity

C.     Moderate Complexity

D.     High Complexity

42.     In a given case, the overall level of service, and corresponding code, is determined by the history level, examination level, and medical decision-making level.

43.      Thus, for example, Code 99204 (applicable to Level 4 evaluations) requires a Comprehensive History, Comprehensive Examination, and Moderately Complex Medical Decision Making.

44.     If the report of a patient's visit shows that the examination was Problem Focused, the visit can be coded and billed only as a Level 1 evaluation using Code 99201.  This is true even if the record includes, for example, a Comprehensive History and Moderately Complex Medical Decision Making.

45.     Each Evaluation and Management code corresponds to a reimbursement amount from the various federally-funded medical coverage programs.  The reimbursement levels relevant here are:

| Service | Service Level | Code | Reimbursement Amount |
|---|---|---|---|
| New Patient Office Visit | Level 1 | 99201 | $34.30 |
| | Level 2 | 99202 | $60.08 |

|  | Level 3 | 99203 | $89.13 |
| --- | --- | --- | --- |
|  | Level 4 | 99204 | $135.91 |
|  | Level 5 | 99205 | $170.79 |
| Established Patient Office Visit | Level 1 | 99211 | $19.15 |
|  | Level 2 | 99212 | $35.36 |
|  | Level 3 | 99213 | $57.68 |
|  | Level 4 | 99214 | $87.49 |
|  | Level 5 | 99215 | $118.56 |
| Inpatient Admissions Evaluation | Level 1 | 99221 | $83.58 |
|  | Level 2 | 99222 | $117.00 |
|  | Level 3 | 99223 | $170.75 |
| Office Consultation | Level 1 | 99241 | $46.81 |
|  | Level 2 | 99242 | $86.66 |
|  | Level 3 | 99243 | $118.69 |
|  | Level 4 | 99244 | $174.74 |
|  | Level 5 | 99245 | $216.82 |
| Chiropractic Manipulative Treatment | Level 1 | 98940 | $23.66 |
|  | Level 2 | 98941 | $32.61 |
|  | Level 3 | 98942 | $43.03 |

46.     Thus, billing, *e.g.*, a Level 3 new patient visit as a Level 5 new patient visit almost doubles the provider's reimbursement.

## V.     FACTS

47.     Holzer, through its shareholders, employees, and agents acting within the scope of their employment, has engaged in numerous schemes to falsely bill federally-funded medical insurance programs for Evaluation and Management Services and

-12-

other services.

48.     Holzer management and physicians have developed a business culture within the organization that places a premium on revenue-maximization to the detriment of correct and legitimate billing practices.

49.     During a staff meeting on December 10, 2007, each Relator heard John Cunningham, Holzer's Corporate Compliance Officer, state that he wanted to "push the gray areas as far as he could to make money." A similar statement was uttered during another meeting on February 15, 2008, when Mr. Cunningham said that while Holzer wanted to be "compliant and avoid fraud," the goal was to "exploit the gray areas and make money."

50.     On March 27, 2008 Relator Lovett attended a peer-to-peer meeting of Holzer internal medicine physicians lead by Renuka Kandula, head of internal medicine. The meeting included a discussion of the inability of the physicians to satisfy the quotas established by Holzer management for patient exams. The stated reason for this inability was insufficient staffing.  Dr. Kandula stated that there was no need to see more patients so long as the doctors upcoded their records.

51.     Holzer has no employees assigned to audit its claims for Evaluation and Management.

52.     Holzer management, faced with the choice of auditing Evaluation and Management claims or devoting more personnel to coding and submitting claims, chose the latter.

53.     At least 15,000 office visits since 2005 have been improperly coded to reflect a higher level of evaluation than was actually performed, resulting in payments of

-13-

taxpayer dollars to Holzer for false claims on the order of $3,000,000 per year. The purpose for Holzer's pattern of abuse was and is to generate more revenue that permitted by law.

54.    On information and belief, based upon Relators' knowledge of Holzer's practices, attitudes, and records, Holzer's history of submitting false claims as described herein dates back to the mid-1990s.

### A.    Scheme to Upcode New Patient Office Visits

55.    Holzer physicians and other personnel, acting at the direction of Holzer management and within the scope of their employment, regularly code new patient office visits to higher levels of reimbursement than are permitted by the severity of the presenting problem(s) and the level of service actually provided. This practice is known as upcoding.

56.    Holzer's systematic upcoding of new patient office visits and submitting false claims for reimbursement from federally-funded medical coverage programs has been ongoing since before Relator Lovett began working at Holzer in 1999.

57.    Of many thousands of claims illegally upcoded as just described, a specific and representative example is that of Patient 1,[2] a 79-year-old woman enrolled in Medicare.

58.    On February 22, 2008, Patient 1 visited the Holzer Clinic located in Proctorville, Ohio. Patient 1's  visit was prompted by feelings of pain associated with "bowel problems and cramping." Patient 1 was a new patient to Holzer.

_____

[2] Patients are identified by number in order to protect their privacy.

-14-

59. Patient 1 was evaluated by gastroenterologist Dr. Mark Subik, a Holzer shareholder.

60. Patient 1's visit was billed to Medicare by Holzer as a level 4 evaluation under Code 99204, which requires documentation of the following key components:

      a.    comprehensive history;

      b.    comprehensive examination; and

      c.    moderately complex medical decision-making.

61. This claim was false because the level of examination actually performed qualified as detailed. Thus, the visit was a Level 3 evaluation required by law to be billed under Code 99203.

62. Patient 2 is an 80-year-old woman enrolled in Medicare. On February 11, 2008, she was referred to Dr. Mark Christopher for an office consultation at the Holzer Clinic located in Gallipolis, Ohio. Patient 2 was referred as a new patient for a colon screening.

63. Dr. Christopher is a gastroenterologist and a shareholder of Holzer.

64. Patient 2's visit was billed to Medicare by Holzer as a Level 3 consultation under Code 99243, which requires documentation of the following:

      a.    detailed history;

      b.    detailed examination; and

      c.    low complexity medical decision-making.

65. This was a false claim because the level of examination actually performed qualified only as "problem focused," and thus should have been billed as a Level 1 consultation under Code 99241.

-15-

66.     Patient 3 is a 30-year-old woman on Medicaid.  She visited the Holzer Clinic in Jackson, Ohio on February 19, 2008.  Her visit was prompted by complaints of "abdominal pain with nausea and vomiting."  She was a new patient to Holzer.

67.     Patient 3 was evaluated by Dr. Michael R. Canady, a surgeon and shareholder of Holzer.

68.     Patient 3's visit was billed to Medicaid by defendant Holzer as a Level 4 evaluation under Code 99204, which requires documentation of the following key components:

        a.     comprehensive history;

        b.     comprehensive examination; and

        c.     moderately complex medical decision-making.

69.     This was a false claim because the level of history actually performed qualified only as "detailed."  Further, the level of examination actually performed qualified only as "detailed."  Thus, the visit should have been billed as a Level 3 evaluation under Code 99203.

70.     Patient 4 is a 54-year-old woman who is enrolled in Medicaid.  Patient 4 visited the Holzer Clinic in Jackson, Ohio on January 7, 2008.  Patient 4 was referred to Holzer for an office consultation relating to complaints of pain in her back and legs. Patient 4 was a new patient at Holzer Clinic.

71.     Patient 4 was evaluated by Dr. Shailen K. Mehta, a physician and shareholder of Holzer.

72.     Patient 4's visit was billed to Medicaid as a Level 5 consultation under Code 99245, which requires documentation of the following key components:

-16-

      a.     comprehensive history;

      b.     comprehensive examination; and

      c.     highly complex medical decision-making.

73.     This was a false claim because the level of history actually performed qualified only as "detailed." Further, the level of examination actually performed qualified only as "detailed." Thus, the visit should have been billed as a Level 3 consultation under Code 99243.

74.     Patient 5 is a 77-year old woman who is enrolled in Medicare. Patient 5 visited Holzer Clinic Sycamore in Gallipolis, Ohio on January 30, 2008. She was referred to Dr. Black for an office consultation, presenting with a report of chronic recurrent low back pain. She was a new patient to Holzer.

75.     Dr. Black is a physician and shareholder of Holzer.

76.     Patient 5's visit was billed to Medicare by Holzer as a Level 5 consultation under Code 99245.

77.     This was a false claim because the level of examination actually performed qualified only as "detailed." Thus, the visit should have been billed as a Level 3 consultation under Code 99243.

78.     Patient 6 is a 49-year-old man whose health coverage is provided by the Veterans Administration. On February 20, 2008, he visited the Holzer Clinic located in Gallipolis, Ohio. His visit was prompted by heartburn and reflux symptoms.

79.     Patient 6 was evaluated by Dr. Mark Subik, a gastroenterologist and shareholder of Holzer.

80.     Patient 6's visit was billed to the Veterans Administration as a Level 4

-17-

evaluation under Code 99204.

81.     This claim was false because the level of history actually performed qualified only as "detailed." Further, the level of examination actually performed qualified only as "detailed." Thus, the visit was required by law to have been billed as a Level 3 evaluation using Code 99203.

82.     These examples of specific false claims to federal payors reflect a pattern of upcoding in which Holzer has engaged, and has encouraged its physicians and other billers to engage, for years. Such and similar upcoding has resulted in the submission of many thousands of false claims.

### B.     Circumvention of Chiropractic X-ray and Diagnostic Testing Reimbursement Limitations

83.     Providers are entitled to reimbursement for medically-necessary x-rays ordered by an enrollee's treating physician. Reimbursement is not permitted for x-rays ordered by chiropractors, even if the chiropractor regularly treats the enrollee.

84.     Between at least October 2004 and continuing through March 2008, chiropractors working for Holzer within the scope of their employment demonstrably ordered in more than 550 separate diagnostic tests to be performed on enrollees, including x-rays.

85.     Because federal regulations permit reimbursement for such testing pro-cedures only when ordered by medical doctors, Holzer, acting through its agents, submitted claims for the aforementioned testing procedures under the Unique Personal Identification Numbers ("UPINs") of radiologists who did not order such tests be performed, and who in fact had no contact with the enrollees whatsoever.

-18-

86.     This scheme permitted Holzer to obtain reimbursements to which it was not entitled under federally-funded medical program regulations. All claims for reimbursement submitted in this fashion constituted false claims.

87.     Upon information and belief, the scheme to circumvent reimbursement limitations applicable to the ordering of x-rays and other diagnostic testing by non-physicians has been ongoing since for many years.

88.     Of many hundreds of such false claims, a representative example is the case of Patient 7, a 73-year-old woman who is a Medicare beneficiary. On December 12, 2007, she visited Holzer Clinic complaining of acute pain in her lower back.

89.     Patient 7 was evaluated by Defendant Kelley J. Roush, a chiropractor employed by Holzer.

90.     Defendant Roush ordered an x-ray of Patient 7's lumbar spine. The completed x-ray was subsequently reviewed by Dr. Dean A. Siciliano, a radiologist and shareholder of Holzer. Although Defendant Roush ordered the x-ray, it was billed under Dr. Siciliano's UPIN in order to circumvent federally-funded medical coverage program regulations and guidelines that prohibit reimbursement for diagnostic testing when ordered by chiropractors.

91.     Holzer knowingly misrepresented the identity of the person who ordered the x-ray for the purpose of obtaining reimbursement from Medicare.

92.     Patient 8 is a 78-year-old Medicare beneficiary. On January 2, 2008, he visited Holzer Clinic complaining of lower back pain.

93.     Patient 8 was evaluated by Defendant Roush.

94.     Defendant Roush ordered an x-ray of Patient 8's lumbar spine. The

-19-

completed x-ray was subsequently reviewed by Dr. Michael C. Myers, a radiologist and shareholder of Holzer. Although Dr Roush ordered the x-ray, it was billed to Medicare under Dr. Myer's UPIN in order to circumvent federally-funded medical coverage program regulations and guidelines that prohibit reimbursement for diagnostic testing when ordered by chiropractors.

95.    Holzer knowingly misrepresented the identity of the person who ordered the x-ray for the purpose of obtaining reimbursement from Medicare.

96.    Patient 9 is a 66-year-old woman on Medicare. On November 1, 2007, she visited Holzer Clinic Sycamore located Gallipolis, complaining of lower back pain.

97.    Patient 9 was evaluated by Defendant Roush.

98.    Dr. Roush ordered an x-ray of Patient 9's lumbar spine. The completed x-ray was subsequently reviewed by Dr. Myers.

99.    This was a false claim because the x-ray was billed to Medicare despite Medicare regulations stating that no reimbursement would be made for x-rays ordered by chiropractors.

## C.    Scheme to Misrepresent Chiropractic Maintenance Treatments as Active

100.    Limited chiropractic services are covered by federally-funded medical coverage programs only if they are medically necessary, a term which applies, with respect to chiropractic services, only when the patient's condition is either an acute or chronic subluxation of the spine. Subluxation is defined as "a motion segment, in which alignment, movement integrity, and/or physiological function of the spine are altered although contact between joint surfaces remains intact."

101. "Acute subluxation" occurs when a patient has suffered a new injury which is expected to improve through treatment. "Improvement" includes arrested progression of the condition. "Chronic subluxation" is a condition that is not expected to improve significantly, but where the patient's functionality is expected to improve through chiropractic treatment.

102. Medically necessary chiropractic services include active treatment only. Maintenance treatment, meaning treatment designed to support rather than correct a condition, is not medically necessary and thus is not covered.

103. Maintenance treatment includes "a treatment plan that seeks to prevent disease, promote health, and prolong and enhance the quality of life; or therapy that is performed to maintain or prevent deterioration of a chronic condition."

104. When further clinical improvement cannot reasonably be expected from continuous ongoing care, and the chiropractic treatment becomes supportive rather than corrective in nature, the treatment is then considered maintenance therapy.

105. Coding for all chiropractors' treatments billed to federally-funded benefit programs—98940, 98941, and 98942—must contain the modifier "AT" to indicate the treatments are for active as opposed to maintenance treatments.

106. Holzer chiropractors routinely performed, and continue to perform, maintenance chiropractic treatment while billing the services to federally-funded medical coverage programs using the "AT" modifier, even though neither the service provided nor the documentation supported that code.

107. A claim to a federally-funded medical coverage program for reimbursement of active chiropractic treatment when in fact the treatment was for maintenance

-21-

constitutes a false claim.

108.    Upon information and belief, the scheme to misrepresent chiropractic treatments as active rather than maintenance has been ongoing throughout the entire period encompassed by the statute of limitations prescribed by 31 U.S.C. § 3731(b) and encompasses many thousands of claims.

**D.    Upcoding New Patient Office Visits to "Consultations"**

109.    Federally-funded medical coverage programs mandate a distinction between new patient office visits (codes 99201-99205) and consultations (codes 99241-99245).

110.    The 2008 allowable amount for code 99204 in Ohio is $135.11, while the allowable amount for code 99244 is $174.59.  Thus, the difference in allowable amount between a Level 4 new patient office visit and a Level 4 consultation is $39.48.

111.    Consultations are reimbursed at a higher level than new patient office visits of the same service level.  Thus, for example, a physician who performed a Level-4 consultation would be entitled to greater reimbursement than if he had performed a Level-4 new patient evaluation.

112.    A claim which bills a new patient office visit as a consultation is false and the defendant is entitled to no reimbursement thereon.

113.    A patient contact may be billed as a consultation only when the billing physician is asking another physician for advice, opinion, a recommendation, sug-gestion, direction, or counsel in evaluating or treating a patient because that individual has expertise in a specific medical area beyond the requesting professional's knowledge.

-22-

114.    In order for a patient visit to qualify as a consultation, as opposed to a new

patient visit, these three criteria must be satisfied.

   A.    The consultation must be provided by a physician whose opinion or
          advice regarding evaluation and/or management of a specific problem is
          requested by another physician;

   B.     request for a consultation from an appropriate source and the need for
          consultation (i.e., the reason for a consultation service) must be
          documented by the consultant in the patient's medical record; and

   C.    after the consultation is provided, the consultant must prepare a written
          report of his findings and recommendations and provide that written report
          to the referring physician.

115.    In order to receive the substantially-higher reimbursement amounts

available for consultations, Holzer and its physicians routinely and frequently

misrepresented the nature of patient visits by submitting claims for consultations for

patient visits which were required by law to be billed as new patient evaluations.

116.    Every claim for reimbursement submitted as a consultation but which

should have been submitted as a new patient evaluation pursuant to federally-funded

medical coverage program regulations was a false claim.

117.    Upon information and belief, the scheme to upcode new patient visits as

consultations has been ongoing for many years.

118.    A representative example of illegal upcoding of a new-patient to a

consultation is the case of Patient 10, a 71-year-old man on Medicare.

119.    Patient 10 visited the Holzer Clinic on February 21, 2008, in order to

receive a screening for a colonoscopy.  The screening was performed Dr. Mark G.

Christopher, a gastroenterologist and shareholder of Holzer.

120.    Patient 10's visit was billed as a Level 3 consultation under Code 99243.

121. This claim was false because the purpose for the visit was not to seek the advice, opinion, recommendation, suggestion, direction, or counsel of the consulting physician in evaluating Patient 10, but rather for him to undergo a medical procedure. Thus, the visit was required by law to be billed as a new patient evaluation under Code 99203.

122. Patient 11 was a 62-year-old man on Medicare when he visited the Holzer Clinic on February 20, 2008, in order to receive a screening for a colonoscopy. The screening was performed by Dr. Christopher.

123. Patient 11's visit was billed as a Level 3 consultation under Code 99243.

124. This claim was false because the purpose for the visit was not to seek the advice, opinion, recommendation, suggestion, direction, or counsel of the consulting physician in evaluating Patient 11, but rather for him to undergo a medical procedure. Thus, the visit was required by law to be billed as a new patient evaluation under Code 99203.

### E. Scheme to Seek Reimbursements for Evaluations in which the Review of the Patient's History of Present Illness was completed by Non-Physician Personnel

125. Federally-funded medical coverage programs require that each patient visit include a History of Present Illness ("HPI") evaluation. This is an essential aspect of the overall Patient History component.

126. Federally-funded medical coverage programs require that the HPI be conducted by a physician or nurse practitioner, not ancillary personnel.

127. Holzer and its physicians and other employees have routinely permitted or required personnel rather than physicians or nurse practitioners to perform HPI

-24-

evaluations and have billed these services to federally-funded medical coverage programs as though the HPI had been properly conducted by a physician or nurse practitioner.

128.    Each claim for reimbursement in which personnel other than a physician or nurse practitioner complete the HPI evaluation is a false claim.

129.    Relator Mayhew has personally witnessed ancillary personnel performing HPI evaluations in the areas of Opthalmology and Chiropractic.  Upon information and belief, a similar pattern of conduct occurs throughout the Holzer organization.

130.    Upon information and belief, the scheme to falsely bill federally-funded medical coverage programs for HPI evaluations completed by ancillary personnel has been ongoing for many years.

**F.    Scheme to Upcode Initial Inpatient Evaluations**

131.    Physicians who staff hospitals, known as hospitalists, are responsible for conducting initial evaluations of patients entering a hospital for care.

132.    Federally-funded medical coverage programs impose a distinct code range for initial evaluations performed by hospitalists.  This range is 99221 to 99223; the specific codes are defined as follows:

> A.    Code 99221:  the problem requiring admission is generally of low severity, and the documentation must reflect a Chief Complaint, a Detailed or Comprehensive History, a Detailed or Comprehensive Examination, and Low Complexity Medical Decision-Making.
>
> B.    Code 99222:  the problem requiring admission is generally of moderate severity, and the documentation must reflect a Chief Complaint, a Comprehensive History, a Comprehensive Examination, and Moderately Complex Medical Decision-Making.
>
> C.    Code 99223:  the problem requiring admission is generally of high

severity, and the documentation must reflect a Chief Complaint, a Comprehensive History, a Comprehensive Examination, and Highly Complex Medical Decision-Making.

133.   Holzer and its hospitalists have for many years routinely upcoded their claims and increased their receipts from federally-funded medical coverage programs for initial inpatient evaluations by using higher codes than were permitted by law, given the severity of the presenting problem and the level of evaluation actually performed.

134.   Every claim for reimbursement submitted to Medicare or Medicaid in which the level of service performed during an initial inpatient evaluation was actually lower than what was represented by the code used was a false claim.

135.   Upon information and belief, the scheme to upcode inpatient admission evaluations has been ongoing for many years.

136.   A representative example of illegal upcoding as just described is that of Patient 12, a 73-year-old woman who was seen by Dr. Rajendra Sajjan at the Holzer Medical Center in Gallipolis, Ohio.

137.   Dr. Sajjan is a hospitalist specializing in internal medicine who performs initial inpatient evaluations of patients admitted to Holzer Medical Center.  Dr. Sajjan is a shareholder of Holzer.

138.   Patient 12 was evaluated by Dr. Sajjan on January 13, 2008 with complaints presented as difficulty breathing and cough with phlegm.

139.   The examination of Patient 12 was billed to Medicare by Holzer at the highest level permitted for a hospital inpatient examination, under Code 99223.  This level evaluation requires performance and documentation of the following key components:

-26-

          a.     comprehensive history;

          b.     comprehensive examination; and

          c.     highly complex medical decision-making.

140. This was a false claim because the level of examination actually performed qualified only as "detailed." Thus, the visit should have been billed as a Level 1 examination under Code 99221.

141. Patient 13 is a 54-year-old woman who was seen by Dr. Sajjan at the Holzer Medical Center in Gallipolis, Ohio on January 16, 2008, with complaints presented as hacking cough and general feelings of illness.

142. The examination of Patient 13 was billed to Medicaid by Holzer at the highest level for a hospital inpatient examination, under Code 99223.

143. This was a false claim because the level of examination actually per-formed qualified only as "detailed." Thus, the visit was required by law to be billed as a Level 1 evaluation under Code 99221.

## G.    Scheme to Provide Specialty Medical Services Using *Locum Tenens* Physicians

144. Pursuant to federally-funded medical coverage program regulations and guidelines, substitute physicians can provide medical services in lieu of a regular physician if the regular physician is unavailable for reasons including, but not neces-sarily limited to illness, vacation, continuing education, and pregnancy. These are known as locum tenens arrangements

145. *Locum tenens* physicians generally have no practice of their own, and are considered to be contractors of the regular physician rather than employees.

-27-

146.    In order to qualify for reimbursement from a federally-funded medical

coverage program for services provided by a *locum tenens* physician, the following

criteria must be met:

> A.    The regular physician must be unavailable to provide the visit
> services;
>
> B.    The Medicare beneficiary has arranged or seeks to receive the visit
> services from the regular physician;
>
> C.    The regular physician pays the *locum tenens* for his/her services on
> a per diem or similar fee-for-time basis;
>
> D.    The substitute physician does not provide the visit services to
> Medicare patients over a continuous period of longer than 60 days;
> and
>
> E.    The regular physician identifies the services as substitute physician
> services meeting the requirements of this section by entering
> HCPCS code modifier Q6 (service furnished by a locum tenens
> physician) after the procedure code.

147.    While *locum tenens* physicians may be used to provide services in place

of a physician who has been terminated from or has departed the group, such services

cannot be provided by the *locum tenens* for longer than 60 days.

148.    Holzer utilizes *locum tenens* physicians to provide services to many of its

patients, including those who are enrolled in federally-funded medical coverage

programs.  In many cases, these *locum tenens* physicians provide services even when

there are no underlying regular physicians.  For example, although Holzer does not

currently employ regular physicians in the fields of nephrology or neurology, these

services are provided by *locum tenens* physicians.  In such cases, the UPINs of

physicians unrelated to and who had no participation in the services rendered are used

-28-

for billing purposes. This practice allows Holzer to provide a broader array of services to federally-funded medical coverage enrollees than permitted under federal regulations or guidelines.

149. Holzer also retains the services of *locum tenens* physicians for periods longer than the 60 days permitted by law.

150. Claims resulting from services rendered by *locum tenens* physicians who do not fit the results in a false claim because there is no corresponding regular physician whose absence requires physician substitution and because the use of an unrelated physician's UPIN constitutes a material misrepresentation.

151. Upon information and belief, Holzer's scheme to falsely bill federally-funded medical coverage programs for services rendered by *locum tenens* physicians where no regular physician exists has been ongoing throughout the entire period encompassed by the statute of limitations prescribed by 31 U.S.C. § 3731(b).

152. All actions complained of herein were done knowingly, as that term is defined in the False Claims Act.

### COUNT 1

### Violation of False Claims Act – 31 U.S.C. Section 3729(a)(1)

153. Relators re-allege ¶¶ 1-152 as if fully set forth herein.

154. Defendants' knowing submission of false claims to the United States and to state Medicaid programs violates 31 U.S.C. § 3729(a)(1).

155. Defendants' knowing use of false documents to get false claims paid violates 31 U.S.C. § 3729(a)(2).

-29-

WHEREFORE, Relators request the following relief:

A.      Judgment against defendants for three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of $11,000 for each violation of the False Claims Act.

B.      25% of the proceeds of this action if the United States elects to intervene, and 30% if it does not.

C.      Their attorneys' fees, costs, and expenses.

D.      Such other relief as the Court deems just and appropriate.


Respectfully submitted,


Frederick M. Morgan, Jr. (0027687)
MORGAN VERKAMP LLP
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202
Tel. (513) 651-4400
Fax (513) 651-4405
e-mail rick.morgan@morganverkamp.com